**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BILLY RICHMOND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 11 C 65** |
| | ) | |
| **THOMAS DART, RICHARD CASTRO,** | ) | |
| **DUANE COLLINS, ANTONIO IMHOF,** | ) | |
| **ROBERT LUCAS, EARL TUCKER, and** | ) | |
| **COUNTY OF COOK,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Billy Richmond has sued Cook County, Sheriff Thomas Dart, and Cook County

Department of Corrections employees Richard Castro, Duane Collins, Antonio Imhof,

Robert Lucas, and Earl Tucker. He contends that the defendants acted with deliberate

indifference in responding to an attack on him on August 20, 2010, while he was being

held as a pretrial detainee at the Cook County Jail, and in failing to transfer him to a less

dangerous tier in the jail prior to the attack. Richmond also asserts related claims

against the individual defendants for willful and wanton conduct under Illinois law, and

against the Sheriff for *respondeat superior* liability.

Defendants have moved for summary judgment, arguing that Richmond failed to

exhaust his administrative remedies and alternatively that his claims fail on the merits.

The Court previously denied summary judgment on the exhaustion defense and set that

issue for an evidentiary hearing. *Richmond v. Dart*, No. 11 C 65, 2012 WL 6138751, at

*1 (N.D. Ill. Dec. 11, 2012).  Defendants thereafter waived their defense of non-exhaustion.  Thus the only remaining part of the defendants' motion for summary judgment involves the merits of Richmond's claims.  For the reasons stated below, the Court grants defendants' motion for summary judgment in part and denies it in part.

**Facts**

On March 9, 2010, Richmond entered the Cook County Jail (CCJ) as a pretrial detainee and was placed in Tier B4 of Division I.  Richmond, who says he was not a member of a street gang, initially shared a cell with Francis Whitten, a member of the Black P-Stone Nation street gang.  At some point, the two realized that Richmond had witnessed the shooting for which Whitten was currently charged, in which he was claimed to have shot a member of the rival Folk Nation street gang alliance.  According to Richmond, he had seen that the victim of the shooting "had a gun on him as well" and agreed to testify to that effect at Whitten's retrial.  Pl.'s Ex. 1 at 43.

During his deposition, Richmond testified that word got out that he was testifying on Whitten's behalf, and gang members affiliated with the Folk Nation alliance (including members of the Gangster Disciples and the Latin Folks) began to threaten him to convince him not to testify.  Richmond started receiving "kites"—anonymous notes passed from prisoner to prisoner and eventually hand-delivered to him—containing threats of violence if he testified at Whitten's trial.  The threats became more serious when Whitten was transferred out of Tier B4.

According to Richmond, on at least six occasions, he reported the threats to Lieutenant Tucker, a supervisor in Division I, and Sergeant Collins, who was assigned to work the "boulevard" in the basement of Division I, and asked them to move him to a

different tier in CCJ. Specifically, Richmond testified that he told them that gang members were "trying to jump" him and would try to kill him, and that he was not affiliated with any gang who could protect him. *Id.* at 51. Tucker asked Richmond which gang was threatening him, and he reported that the Gangster Disciplines and the Latin Folks were threatening him because of his decision to testify on Whitten's behalf. Richmond asked to be transferred out of Tier B4, to which Tucker responded that he must "put in a request" to move to a different tier. *Id.* at 53. His other reports regarding threats that he made to Collins and Tucker were similarly rebuffed. Richmond says they told him that the CCJ was overcrowded—explaining that "we'll get to you when we get to you," and directing him to submit more request forms. *Id.* at 57.

It is undisputed that Richmond submitted a number of request forms seeking transfer to a different tier. It is also undisputed that Richmond was not transferred from Tier B4 in Division I prior to August 20, 2010. On that date, Richmond was physically attacked by members of the Folk Nation alliance and suffered injuries.

Richmond admits that in his complaints and transfer requests, he did not name the specific gang members who had threatened him. He contends, however, that CCJ personnel knew the gang classifications of prisoners based on their visible tattoos marking their gang affiliation and the way that prisoners congregated in the common areas of the jail. Officer Castro, a tier officer, testified that he could identify a detainee's gang membership based on his tattoos, and he also stated that a prisoner's gang membership was often recorded on CCJ's computer database.

The parties dispute several of the events surrounding the incident on August 20. Richmond testified that earlier that evening, he was escorted from his cell for a visit.

Officer Castro was supervising Tier B4 at the time. Richmond returned to the tier around 6 p.m. He handed Castro his identification card, and Castro let him into the common-area dayroom on the tier, where half of the tier's inmates were out of their cells for scheduled recreation time. According to Richmond, Castro was supervising both Tiers B4 and A4 at the time. As soon as he let Richmond into the dayroom, Castro turned his back to Tier B4 to address a group of inmates gathered in the dayroom of Tier A4. While Castro was talking to the men in Tier A4, five men from the Folk Nation alliance gathered around Richmond. Richmond testified that he called out to Castro, but Castro told him to "hold on, wait a minute." *Id.* at 106. Castro continued talking to the men in A4, turning only momentarily toward the B wing. At that point, Richmond says, the men pushed him into Cell 00, an empty cell near the dayroom. Richmond testified that there was a wall blocking Castro's view of him from where Castro was standing in Tier A4. Richmond lost track of Castro after that.

Richmond testified that he tried to fight back against the men and shield himself from being hit, but he soon lost consciousness from the beating. When he came to, Richmond was on the ground. He began grabbing at the inmates' legs to stop them from kicking him. Richmond saw that one of the men had a shank, so he grabbed the man's arms to keep from getting stabbed. Richmond stated that he saw an opening in the group and was able to escape from the cell into the open dayroom. The men followed Richmond and began kicking him in the common area. Soon afterward, several officers arrived at the tier. Richmond was eventually taken to Cermak Health Services. Richmond could not name most of the men who attacked him—identifying them only as members of Folk Nation gangs—but he did specifically identify a man with

4

the last name of Vargas as one of his attackers. He later identified another inmate involved as "Chico." Pl.'s Ex. I at 3.

Castro testified during his deposition that he was not supervising both tiers at the time of the incident and that Officer Gilberto Mercado was present and responsible for supervision of Tier A4 at the time. Mercado also testified that he was present at the time. Castro testified that Vargas, not Richmond, left the tier for visitation, and that Richmond, not Vargas, was out of his cell for scheduled recreation time.

Castro admitted that from his post on the tier, he could not see Cell 00. He testified that he "heard a commotion" coming from the cell and that when he got up to look, he saw a group of approximately fifteen inmates crowded around that cell. Defs.' Ex. 2 at 43. Castro began yelling at the group, and soon after, he saw Vargas run out of the cell. Moments later, Richmond walked out of Cell 00 into the dayroom, covered in blood. According to Castro, Richmond punched another inmate and asked him, "[w]hy didn't you help me." Id. at 35. Castro did not leave his guard post but instead called his supervisor on his two-way radio to report that there was a fight in progress. Approximately twenty officers responded to the call, but by that point, everyone but Richmond had returned to their cells.

Sergeant Lucas, Castro's immediate supervisor, and Lieutenant Imhof, a lieutenant supervisor for Division I responsible for supervision during the afternoon shift, were among those who responded to the call. Neither Lucas nor Imhof specifically remembers the August 20 incident. They both acknowledge, however, that they did work that day. Both testified that they were partially responsible for creating the afternoon roster, which detailed each officer's assignment for that shift.

After the incident, Richmond was taken to Cermak Health Services, CCJ's medical unit.  Richmond stated in an affidavit that from there, he was transferred to Stroger Hospital for medical treatment.  He was eventually returned to CCJ.

In his third amended complaint, Richmond asserts eight claims.  Counts 1 through 3 are claims brought pursuant to 42 U.S.C. § 1983, in which Richmond alleges that:  (1) the defendants failed to protect him from harm by acting with deliberate indifference to a substantial risk of harm to him; (2) they conspired to operate CCJ unconstitutionally and in violation of a consent decree; and (3) they violated his constitutional rights by continuing to operate the CCJ in an unconstitutional manner and in violation of the consent decree, which put him at substantial risk of harm.  Counts 4 through 8 of Richmond's complaint allege related state claims:  (4) intentional infliction of emotional distress, (5) civil conspiracy, (6) willful and wanton misconduct, (7) *respondeat superior*, and (8) indemnification.

## Procedural issues

### A.    Richmond's request to dismiss certain claims

In response to defendants' motion for summary judgment, Richmond's counsel asks the Court to dismiss a number of his claims with prejudice.  Specifically, Richmond requests dismissal of Counts 2 through 5 in their entirety, Count 1 insofar as it alleges a section 1983 claim against any defendant in his official capacity, and Count 7 except insofar as it alleges negligence by supervisors.  The Court grants the request.  These claims are dismissed with prejudice.

### B.    Defendants' motion to strike

Defendants have objected to many of the assertions in Richmond's Local Rule

56.1(b)(3)(C) statement of material facts and his Local Rule 56.1(b)(3)(B) response to defendants' statement of facts, arguing that they do not include proper citations to the record, are argumentative, assert legal conclusions, or improperly include additional facts.  Factual assertions and denials in Local Rule 56.1 statements must be supported by citations to the record.  N.D. Ill. R. 56.1(a); *Malec v. Sanford*, 191 F.R.D. 581, 583–85 (N.D. Ill. 2000).  The Court agrees that many of Richmond's assertions of fact and denials of defendant's statement of facts are improper because they fail to cite supporting evidence.  *See Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("[A] district court is entitled to expect strict compliance with Rule 56.1."). Accordingly, the Court will not consider any improper assertions or denials unsupported by record citations or those that contain improper argument.

Defendants have also asked the Court to disregard three of Richmond's exhibits submitted in response to defendants' summary judgment motion on the ground that they have not been properly authenticated.  In a previous decision, the Court denied that request with regard to Richmond's medical records from Cermak Health Services. Because the Court does not rely on the two other exhibits in resolving defendants' motion for summary judgment, the Court need not address the remainder of this request.

### Discussion

Summary judgment is proper when "the admissible evidence, construed in favor of the non-movant, reveals no genuine issue as to any material facts and establishes that the movant is entitled to judgment as a matter of law."  *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 690–91 (7th Cir. 2010).  A genuine issue of material fact exists if there is

sufficient evidence to allow a reasonable jury to find in favor of the non-movant.

*Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010). On a

motion for summary judgment, a court does not weigh evidence or determine the

credibility of any properly considered testimony. *Berry*, 618 F.3d at 691 (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## A.     Section 1983 claim

Richmond contends that defendants failed to protect him from the August 20

assault on him at CCJ. Because Richmond was a pretrial detainee, his section 1983

claims are analyzed under the Due Process Clause of the Fourteenth Amendment. *Bell*

*v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Guzman v. Sheahan*, 495 F.3d 852, 856 (7th

Cir. 2007). The protections for pretrial detainees under the Fourteenth Amendment are

at least as great as those available to convicted prisoners under the Eighth Amendment,

*Washington v. LaPorte Cnty. Sheriff's Dep't*, 306 F.3d 515, 517 (7th Cir. 2002), and

courts often look to the analogous Eighth Amendment standards in evaluating a pretrial

detainee's claim. *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002).

Prison and jail officials owe detainees, who have been stripped "of virtually every

means of self-protection," a duty to protect them from violence inflicted by other

inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Haley v. Gross*, 86 F.3d 630,

640 (7th Cir. 1996). In *Farmer*, the Supreme Court set forth the standard by which

courts analyze failure-to-protect claims in the jail or prison context. *Farmer*, 511 U.S. at

834. First, a prisoner must show that "he was incarcerated under conditions posing a

substantial risk of serious harm." *Palmer v. Marion Cnty.*, 327 F.3d 588, 593 (7th Cir.

2003) (internal quotation marks omitted). Next, the prisoner must show that prison

officials acted with "deliberate indifference"—that is, that the defendants had actual knowledge of an impending harm, such that "a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010); *see also Vance v. Peters*, 97 F.3d 987, 991–92 (7th Cir. 1996).

### 1.   Defendants Collins and Tucker

Richmond contends that Sergeant Collins and Lieutenant Tucker violated his rights under the Due Process Clause when they failed to act in response to his repeated reports of gang threats and his requests to be moved to a different tier within the CCJ. Collins and Tucker argue that Richmond's reports were not sufficiently specific to put them on notice of a particularized threat because Richmond never specifically told them the names of the gang members who had threatened him.

Richmond testified that he received many of these threats through anonymous notes and that he himself did not know the identity of the gang members who were threatening him.  He stated that he communicated to Collins and Tucker, repeatedly, what he did know—specifically, that he was being threatened by members of the Folk Nation alliance because he agreed to testify in favor of a rival gang member.  Richmond followed up on those reports by submitting multiple requests, asking to be transferred to a different tier.  Additionally, Castro's testimony that gang members often had identifiable tattoos or were identified in the CCJ database suggests that Collins and Tucker were on notice regarding who, in Tier B4, presented the greatest threat to Richmond's safety given the nature of his complaints.  *See Farmer*, 511 U.S. at 843 (correctional officials cannot escape liability because they do not know "whether the risk

comes from a single source or multiple sources").

Given this evidence, the Court concludes that a reasonable jury could determine that Collins and Tucker were aware of the threats made against Richmond, inferred from that knowledge that there was a substantial risk of serious harm to him, and yet acted with deliberate indifference in failing to respond to his requests. Collins and Tucker are therefore not entitled to summary judgment

### 2. Defendants Imhof and Lucas

Richmond's complaint named Lieutenant Imhof and Sergeant Lucas as defendants in their official capacities. He now seeks to amend to sue them in their individual capacities.

It should have been fairly obvious to all concerned, including defendants and their counsel, that the complaint's reference to claims against these defendants only in their official capacity was an error. An official capacity suit against an employee of a governmental entity is effectively a suit against the entity itself, *see, e.g., Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1071 (7th Cir. 2012), and here Richmond had asserted claims directly against the Sheriff and the County.

The Court grants Richmond's request to amend. Defendants have shown no prejudice from the proposed amendment. Specifically, they do not indicate that they would have done anything differently had Richmond included the phrase "individual capacity" in his complaint from the outset.

The Court proceeds to consider Imhof and Lucas's request for summary judgment. "[U]nder § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Gentry v. Duckworth*, 65 F.3d

555, 561 (7th Cir. 1995); *see also Palmer*, 327 F.3d at 594 (liability cannot be based solely on individual's supervisory role).  The Seventh Circuit has stated that a supervisor may be held liable for a constitutional violation "if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent."  *Vance*, 97 F.3d at 993.

Richmond does not contend that either Imhof or Lucas was directly involved with the August 20 assault.  Instead, Richmond contends that Lucas and Imhof are liable because they prepared a roster providing for staff assignments that "allowed for cross-watching" and because they, as supervisors, failed to monitor tier officer breaks adequately.  Pl.'s Resp. at 16.  The record indicates that there are four floors in Division I, and that each floor has two tiers facing one another.  Between the tiers, there is a control room for CCJ personnel, from which an officer can see one tier or the other, but not both at the same time.  "Cross-watching" occurs when there is only one officer in the control room.  Richmond makes much of the fact that cross-watching violates the consent decree in *Duran v. Elrod*, No. 74 C 2949 (N.D. Ill. Apr. 9, 1982).  Pl.'s Ex. D.  Richmond's reliance on *Duran* is misplaced.  To prevail on a claim under section 1983, a plaintiff must present evidence of a constitutional violation.  Although the presence of a consent decree may be relevant on the issue of deliberate indifference, the violation of a consent decree does not, by itself, amount to a constitutional violation.  *See Martin v. Davies*, 917 F.2d 336, 339 (7th Cir. 1990) (interpretation of consent decree is governed by contract law, not constitutional law); *Hampton v. Fairman*, No. 93 C 4076, 1995 WL 144440, at *3 (N.D. Ill. Mar. 30, 1995) (courts must evaluate section 1983 claims directly under constitutional standards); *see also Cagle v. Sutherland*, 334 F.3d 980, 987 n.9

(11th Cir. 2003) (consent decrees can be enforced by contempt citations, and thus section 1983 remedies in this context are unnecessary).

Both Imhof and Lucas admitted that occasionally an officer assigned to supervise a tier would take a short break, and that during that time, the remaining officer would be responsible for watching both the A and B tier. They also contend, however, that these breaks, which typically occurred when one guard left to use the bathroom, lasted no longer than approximately ten minutes. Richmond has offered no evidence that the schedule that Imhof and Lucas prepared for August 20, 2010 provided for only a single officer to monitor both tiers on the fourth floor of Division I, and there is no evidence that either Imhof or Lucas had any knowledge that Castro was cross-watching both Tier A4 and Tier B4 that day. In addition, unlike in other cases involving cross-watching, Richmond has presented no evidence that Imhof or Lucas was aware of a substantial risk to inmate safety that would result if an officer was responsible for watching two tiers for the ten minute period that conceded might occur. *Compare Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 299 (7th Cir. 2010) (evidence that supervising officers recorded reflections that cross-watching was a major security risk); *Mayoral v. Sheahan*, 245 F.3d 934, 936 (7th Cir. 2001) (evidence that supervising officer did not have sufficient experience to be cross-watching two tiers); *Perez v. Velasco*, No. 98 C 8018, 2001 WL 844496, at *4 (N.D. Ill. July 23, 2001) (evidence that cross-watching was the norm at CCJ). The Court concludes that the record does not contain evidence from which a reasonable finder of fact could infer that Imhof or Lucas knew that the conditions of Richmond's confinement posed a substantial risk of serious harm and turned a blind eye.

For these reasons, the Court grants summary judgment in favor of Imhof and Lucas.

### 3. Defendant Castro

The final defendant whom Richmond has sued in an individual capacity is Officer Castro, the officer who was supervising Tier B4 when Richmond was attacked. Richmond contends that Castro was deliberately indifferent to his safety when he failed to supervise Tier B4 adequately and failed to respond appropriately to Richmond's shouts in the moments immediately preceding the attack.

Richmond testified that immediately after letting him into the dayroom on Tier B4, Castro turned his back on the tier and began talking to a group gathered in the dayroom in Tier A4. When a group of men began surrounding Richmond, he says, he called out to get Castro's attention. Castro turned toward him and gestured for him to wait. Whether Richmond's yells to Castro were enough to put him on sufficient notice of a substantial risk to Richmond's safety poses a genuine issue of fact. The Court concludes a reasonable jury that believed Richmond's testimony regarding Castro's actions could conclude that Castro was sufficiently aware of the risk to Richmond and yet turned a blind eye.

Castro also contends that his response was reasonable. "Prison officials who had actual awareness of a substantial risk to the health or safety of an inmate incur no liability if they responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent." *Guzman*, 495 F.3d at 857 (internal quotation marks omitted). Castro correctly argues that his decision not to personally break up the fight cannot be considered deliberate

indifference.  *See Shields v. Dart*, 664 F.3d 178, 181 (7th Cir. 2011) (prison guards need not significantly jeopardize their own safety in responding to risk of prisoner's safety).  But that is not the issue.  Rather, Richmond contends that Castro's alleged deliberate indifference consisted of his failure to respond to Richmond's yells for attention, before the beating occurred.  Castro's alleged delay in responding to the fight on Tier B4 suggests an unreasonable delay in calling for back-up or taking other appropriate action, a delay that a jury may conclude is sufficient to support Richmond's deliberate–indifference claim.  *See McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (length of delay that is tolerable in jail personnel's response to prisoner's needs depends on the seriousness of prisoner's condition).  This inquiry involves questions of fact.  There is evidence from which a jury could infer that Castro was subjectively aware of a substantial risk to Richmond's safety and was deliberately indifferent to that risk by failing to respond appropriately.  Castro is not entitled to summary judgment.

**B.    State-law claims**

Richmond has also brought a claim against the five defendants discussed above for willful and wanton conduct under Illinois law, and he seeks to impose *respondeat superior* liability on the Sheriff on the basis of the individual defendants' conduct.  Illinois state law defines willful and wanton conduct as conduct that shows an actual intent to cause harm or "an utter indifference to or conscious disregard for the safety of others or their property."  745 ILCS 10/1-210.  The Illinois Supreme Court has recognized that negligence is not the same as willful and wanton conduct because the latter "approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in

conscious disregard of it." *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 415–16, 563 N.E.2d 397, 402 (1990).

The Seventh Circuit has noted that the standard for assessing whether conduct is willful and wanton is "remarkably similar to the deliberate indifference standard." *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007) (internal quotation marks omitted); *Chapman v. Keltner*, 241 F.3d 842, 847 (7th Cir. 2001). Based on the analysis discussed above, the Court declines to enter summary judgment on the state-law claims as to defendants Collins, Tucker, and Castro but grants summary judgment on those claims as to defendants Imhof and Lucas. Finally, because the state-law claims survive as to certain defendants, the Sheriff is not entitled to summary judgment on Richmond's *respondeat superior* claim. *Williams*, 509 F.3d at 405 (citing 745 ILCS 10/4-105).

## Conclusion

For the reasons stated above, the Court grants defendants' motion for summary judgment in part and denies it in part [docket no. 91]. Specifically, the Court grants summary judgment in favor of defendants Imhof and Lucas and terminates them as parties. Additionally, the Court dismisses Counts 2 through 5; Count 8; Count 1 insofar as it alleges section 1983 liability against any defendant in his official capacity; and Count 7 except to the extent it alleges a *respondeat superior* claim against the Sheriff. The case is set for a status hearing on March 26, 2013 at 9:30 a.m. for the purpose of setting a trial date.

_____

MATTHEW F. KENNELLY
United States District Judge

Date:  March 20, 2013